IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JAMES H. WHITE,

                 Plaintiff,

    v.

PRUDENTIAL INSURANCE
COMPANY OF AMERICA,

              Defendant.

CIVIL ACTION
NO. 11-3394

## OPINION

**Slomsky, J.**                            **November 9, 2012**

### TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL AND PROCEDURAL SUMMARY ............................................. 3

III.    ERISA STANDARD OF REVIEW ................................................................... 8

IV.    ANALYSIS ........................................................................................................... 12

        A.     Definition of "Disability" and Plaintiff's Depression and Anxiety ..................... 12

        B.     Events of the Automobile Accident ................................................................. 17

        C.     Plaintiff's Physicians ...................................................................................... 19

               1.     Dr. DiBella, Dr. Anderson, Dr. Kralick, and Dr. Kaplan ........................ 19

               2.     Dr. Mañon-Espaillat .............................................................................. 20

               3.     Dr. Maitz and Dr. Divi ........................................................................... 21

               4.     Dr. Michel and Dr. Shapiro — Independent Non-Treating Consultants .. 22

               5.     Dr. Sachetti ........................................................................................... 22

                6.     Dr. Picariello and Barry Belt, M.A. ....................................................... 23

D.    Prudential's Reviewing Consultants ............................................................. 24

    1.    Dr. Obianwu and Dr. Yohman ................................................. 24

    2.    Dr. Banks ................................................................................. 25

    3.    Dr. Attfield .............................................................................. 25

    4.    Dr. Neuren ............................................................................... 26

    5.    Dr. Kolbell .............................................................................. 26

    6.    Dr. Appelbaum ........................................................................ 27

E.    The Administrative Record Establishes That Plaintiff Suffered a Traumatic Brain Injury on April 21, 2007 in an Automobile Accident ........................................... 27

F.    Errors in the Administrative Record ............................................................. 28

G.    Mistakes Undermining Prudential's Fact-Finding ....................................... 29

V.    CONCLUSION ....................................................................................................... 31

## I.     INTRODUCTION

Under the Employee Retirement Income Security Act of 1964 ("ERISA"), a district court has jurisdiction to enforce the rights of a plan participant with a long-term disability.  Plaintiff James White brought this action for enforcement of his rights under a provision of ERISA, 29 U.S.C. § 1132(a)(1)(B),[1] after Defendant Prudential Insurance Company of America ("Prudential") terminated his long-term disability benefits.  Plaintiff alleges he endured a traumatic brain injury in a rollover automobile accident, while Prudential contends that at most, he suffers from a mental illness not caused by trauma.  Under the Long Term Disability Policy ("the Plan"), if a disability is due solely to mental illness, disability benefits are limited to twenty-four months.

The Plan defines a disability as follows:

You are disabled when Prudential determines that:
- you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your *indexed monthly earnings* due to that *sickness* or *injury*.

After 60 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any *gainful occupation* for which you are reasonably fitted by education, training or experience.

(Administrative Record ("R.") at D1210 (emphasis in original).)  The plan defines "sickness" as "any disorder of your body or mind, but not an injury . . . . Disability must begin while you are

---

[1] 29 U.S.C. § 1132(a)(1)(B) provides:

Civil Enforcement
(a) Persons empowered to bring a civil action
A civil action may be brought—
(1) by a participant or beneficiary—
. . . .
(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . .

1

covered under the plan." (Id.) "Injury" is defined as "a bodily injury that is the direct result of an accident and not related to any other cause.  Injury which occurs before you are covered under the plan will be treated as a sickness.  Disability must begin while you are covered under the plan." (Id.)  The Plan language limiting benefits for disability due to mental illness is as follows:

> Disabilities which, as determined by Prudential, are due in whole or part to **_mental illness_** have a limited pay period during your lifetime.  The limited pay period for mental illness is 24 months during your lifetime.
> . . . .
> **_Mental illness_** means a psychiatric or psychological condition regardless of cause.  Mental illness includes but is not limited to . . . depression . . . or . . . anxiety . . . .

(R. at D1218–19 (emphasis in original). )

The parties have filed cross-motions, asking the Court to decide this matter on the administrative record.[2]  (Doc. Nos. 17, 18).  Because Plaintiff's disability is not caused by mental illness, but caused by a physical injury due to a serious automobile accident, the twenty-four month limitation period for mental illness does not apply here, and he should receive benefits for his continuing disability due to sickness or injury.  Therefore, the Court will grant Plaintiff's Motion for Judgment on the Administrative Record and deny Prudential's Motion.  In reaching this conclusion, the Court has reviewed de novo the Administrative Record and considered the parties' Memoranda of Law in Support of their Motions (Doc. Nos.17–1, 18–1), Responses in Opposition (Doc. Nos. 21, 23), and Replies in Further Support of the Motions (Doc. Nos. 27, 28).

---

[2] Plaintiff's motion is titled a "Motion for Judgment on the Administrative Record" (Doc. No. 18), and Prudential's motion is titled a "Motion for Summary Judgment" (Doc. No. 17).  The Court will treat both motions the same — regardless of title — by applying the same standard of review, and decide the case on the basis of the administrative record.  See infra Part III.

## II.      FACTUAL AND PROCEDURAL SUMMARY

Before April 21, 2007, Plaintiff was employed as Chief Operating Officer, Chief

Financial Officer, and Director of Risk Management at Holt Oversight & Logistical

Technologies ("Holt").  (Doc. No. 18–1 at 7.)  His responsibilities were extensive and required a

high degree of professional skill.  (Id. at 7–8.)  The work required performing complex tasks

under pressure and meeting financial goals and objectives set by the employer.  (Id. at 8.)  He

earned an annual salary of $255,000.  (Id. at 7.)

On April 21, 2007, Plaintiff was driving an SUV on Interstate 95 with his wife Anita,

three of his four children, James Jr., Colin, and Sophia, and his nephew Thomas.  (Id. at 9.)

While traveling at highway speed, his SUV was struck by another vehicle at the driver's side rear

wheel.  (Id.)  The collision caused his SUV to flip over numerous times before landing on its

roof, and then to slide some distance, upside-down, before stopping against a barrier.  (R. at

D632.)  The roof of the SUV caved in along with the windshield.[3]  Plaintiff claims he and his

wife both lost consciousness during the accident.[4]  (R. at D120–22.)

Plaintiff was transported to Thomas Jefferson University Hospital.  (Doc. No. 18–1 at

10.)  His medical records from the hospital visit do not detail any head trauma, complaints of

headache, or other head pain.  (R. at 260–306.)  His discharge instructions note only a mild

---

[3] Post-accident color photographs of the SUV are attached to the Complaint.  (Doc. No. 1 at 58–
59.)  The damage is extensive and horrific.

[4] Reports of Philadelphia Fire Department paramedics who responded to the accident are
included in the Administrative Record.  (R. at D629–30, D938–39.)  Anita's paramedic report
states that Anita denied neck or back pain, but was unsure if she passed out and complained of a
headache.  (R. at D629–30.)  Anita was later diagnosed with a fractured neck.  (R. at D121,
D902.)  Prudential disputes Plaintiff's claim that he lost consciousness.  However, as discussed
infra, the evidence in the administrative record — including the affidavit of his son, James Jr.,
who was in the SUV during the accident — supports Plaintiff's assertion that he lost
consciousness.

bulging of cervical discs C6–7, and that he was given a prescription of oxycodone and ibuprofen. (R. at D296–97.)  Immediately after being discharged from Jefferson Hospital, Plaintiff visited his wife, who was admitted to Hahnemann University Hospital.  (Doc. No. 18–1 at 10.)  While there, Plaintiff became "dizzy, sweaty, and almost passed out while assisting [his] wife."  (R. at D137.)  He was then admitted to the emergency room at Hahnemann Hospital for evaluation. (Doc. No. 18–1 at 10.)  Plaintiff was discharged without a diagnosis of head trauma.

A week after the accident, for reasons not clear in the Administrative Record, Plaintiff lost his job as chief financial officer at Holt.  (Doc. No. 17–1 at 6.)  He was offered a position as chief operating officer at one of Holt's subsidiaries, which he declined to accept.  (Id.)  He did not return to work in any position after the accident, and continued to see doctors through the summer of 2007.

On September 12, 2007, after exhausting his sick, personal, and vacation time, Plaintiff applied for Long-Term Disability benefits with Prudential, the insurance company administering and covering such benefits through his employer, Holt.  (Doc. No. 18–1 at 15.)  On November 27, 2007, Prudential denied Plaintiff's claim for benefits, citing the report of Dr. Kaplan, one of the treating physicians, that Plaintiff was "alert and oriented. . . . could sit, stand, and walk without physical limitation," and that "Dr. Kaplan opined that [Plaintiff] had no objective evidence of traumatic brain injury."  (R. at 1158–60.)  Prudential also noted and relied upon the following:

> [A] lack of intensity of treatment between your discharge from the hospital and treatment by Dr. Kaplan on September 4, 2007.  We would expect that if your pain complaints or memory and concentration difficulties were so debilitating to impair functioning, you would have sought medical treatment.  In our telephone conversation on November 1, 2007, you indicated that you help your wife with your three year old child, you help make dinner, you do some yard work and that you are able to drive. . . . All of these activities indicate that you remain active and are able to function.

4

(R. at D1159.)

On January 8, 2008, Plaintiff filed a timely appeal from the denial of benefits, submitting updated medical records. (R. at D932–34.) On July 14, 2008, Prudential upheld the denial of benefits, again citing the failure to satisfy the Plan definition of disability. (R. at D1130–38.)

On February 6, 2009, Plaintiff filed a second appeal. He submitted additional evidence to Prudential. On May 7, 2009, Prudential overturned the denial of benefits and determined that Plaintiff was eligible for coverage. (R. at D1112–14.) Prudential asserted: "Based on additional information submitted during the course of Mr. White's second appeal, we have determined he is currently eligible for benefits on the basis of his claimed cognitive impairments. However, we maintain Mr. White is not eligible for benefits on the basis of his claimed orthopedic impairments." (R. at D1113.)

Prudential paid Plaintiff disability benefits retroactive to July 22, 2007, the first date he was eligible to receive Long Term Disability benefits.[5] (Id.) Prudential made two payments, reducing each one by $14,181.26 as offsets for salary paid by the former employer between July 22, 2007 and September 30, 2007. (R. at D1020; D1109.) After Plaintiff's counsel sent letters disputing the offsets, Prudential acknowledged that the Plan did not offset for salary continuations, admitted that money had been "wrongfully withheld," and restored the withheld funds. (R. at D1019; D1100.)

On September 2, 2009, Prudential notified Plaintiff that it was terminating his benefits because it had "questions about the etiology of the cognitive impairments." (R. at D1103–07.) Prudential stated that his limitations were "due in whole or in part to his mental and nervous

---

[5] Although the accident occurred on April 21, 2007, the Plan contains an "elimination period" in which the covered person must demonstrate a continuous disability for ninety days. (R. at D1211.)

condition(s) of depression and anxiety," and, citing the Plan's twenty-four month limitation for mental illness, concluded that he no longer met the definition of disability under the Plan.  (R. at D1106.)

On January 26, 2010, Plaintiff requested a copy of his file from Prudential, which he received on February 18, 2010.  (R. at D211; D209.)  On February 22, 2010, his prior counsel sent a letter to Prudential refuting assertions made in the decision to terminate benefits.[6]  (R. at D76–77.)  On June 23, 2010, Plaintiff's current counsel appealed the September 2, 2009 termination of benefits to Prudential's Appeals Review Unit.  (R. at D99–106.)

On September 2, 2010, Plaintiff's counsel wrote a letter to Prudential requesting that it update his claim on its website from "terminated" to reflect his timely appeal, and reminded Prudential that it was required under the Plan to decide an appeal within forty-five days, or, upon written explanation of necessity, for an additional forty-five days.  (R. at D92.)  The next day, Prudential sent Plaintiff's file to an external neuropsychologist for review.  (R. at D1090–91.) On September 17, 2010, the reviewing doctor, Dr. Kolbell, issued a report concluding that there was no evidence that Plaintiff suffered from cognitive impairments after December 1, 2009.[7]  (R. at D81–88.)

---

[6] The first sentence in the letter from prior counsel states: "Kindly consider this an appeal of your determination dated September 2, 2009."  (R. at D76.)  Plaintiff's current counsel also filed an appeal.  (R. at D99.)

[7] Plaintiff contends that the issue of whether he suffers from cognitive impairment is not the issue here.  Rather, the issue is whether Prudential was correct in its determination that his injuries are due to mental illness rather than trauma, and fall within the twenty-four month limitation provision of the Plan.  (Doc. No. 18–1 at 35.)

6

On November 3, 2010, 133 days after the June 23, 2010 appeal was filed,[8] Plaintiff's counsel sent another letter to Prudential, complaining about the delay and threatening legal action.  (R. at D70–71.)  On November 24, 2010, counsel sent an additional letter to Prudential, citing a recent decision from a Court in this District, Morgan v. Prudential Insurance. Co. of America, 755 F. Supp. 2d 639 (E.D. Pa. 2010), as being on point.  (R. at D44–64.)  On November 29, 2010, Prudential's internal notes indicate Plaintiff's case was referred for another neurological review "for further clarification."  (R. at D1003.)

On January 14, 2011, counsel for Plaintiff received a letter from Prudential, which he contends is the first correspondence sent by Prudential regarding the appeal.  (R. at D29–30.)  Counsel responded by letter the same day, criticizing Prudential's handling of the appeal and advising that he believed Prudential was in violation of ERISA and the Plan.  (Id.)  Counsel followed up on January 17, 2011 with a written request for Plaintiff's file from Prudential from January 1, 2010 forward.  (R. at D32.)  On January 20, 2011, Prudential responded to the request, stating that it would only provide the file up to the date of the appeal, June 24, 2010, citing a Prudential policy restricting the turning over of a file during a pending appeal.  (R. at D1084–85.)

On January 31, 2011, counsel sent another written request for the file, citing the following language in the Plan's ERISA statement: "Upon your request, you will also have access to and the right to obtain copies of all documents, records, and information relevant to your claim free of charge."  (R. at D17–20.)  Plaintiff received no response from Prudential to this request.  (Doc. No. 18–1 at 35.)

On May 25, 2011, Plaintiff filed the instant lawsuit.

---

[8] As stated, Plaintiff first notified Prudential of his intention to appeal on February 22, 2010 — 254 days earlier.  See supra n. 6 and accompanying text.

**III.     ERISA STANDARD OF REVIEW[9]**

In regard to an action for civil enforcement of ERISA rights under 29 U.S.C.

§ 1132(a)(1)(B), the U.S. Supreme Court explained in Firestone Tire & Rubber Co. v. Bruch,

489 U.S. 101 (1989) that "a denial of benefits challenged under § 1132(a)(1)(B) is to be

reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

Id. at 115.  When the benefit plan gives the administrator or fiduciary the requisite discretionary

authority, a district court must apply the deferential arbitrary and capricious standard.  Howley v.

Mellon Financial Corp., 625 F.3d 788, 792 (3d Cir. 2010).  The parties dispute whether

Prudential has the requisite discretionary authority.

Prudential argues that the Plan grants it broad decisionmaking discretion for two reasons.

First, language in the Plan, such as "[y]ou are disabled when Prudential determines that . . ." (R.

at D1210 (emphasis added)) gives clear discretion to Prudential.  Second, Prudential contends

that the "ERISA Statement" attached to the end of the Plan also gives discretion to Prudential in

determining benefits.  It states: "The Prudential Insurance Company of America as Claims

administrator has the sole discretion to interpret the terms of the Group Contract, to make factual

---

[9] Prudential refers to its motion as a Motion for Summary Judgment, while Plaintiff has titled his cross motion as a Motion for Judgment on the Administrative Record.  When deciding a Motion for Summary Judgment, the Court must render judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When a de novo standard of review is applied to an administrative record, however, the Court resolves disputes of material fact, and is not required to view the evidence in the light most favorable to the nonmoving party, as required under Rule 56. Macfarlan v. Ivy Hill SNF, LLC., 675 F.3d 266, 271 (3d Cir. 2012) (citing Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007)).  In Wilkins v. Baptist Healthcare System, Inc., 150 F.3d 609 (6th Cir. 1998), the Sixth Circuit held that the summary judgment requirements set forth in Federal Rule of Civil Procedure 56 should not be applied to adjudications to enforce ERISA rights.  Id. at 617–620 (Gilman, J., concurring).  Regardless of how Prudential's motion is titled, the Court will make a de novo determination in this case for reasons noted in this Opinion.

findings, and to determine eligibility for benefits.  The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious."  (R. at D1234.)

Plaintiff, on the other hand, contends that these statements do not confer discretionary authority, especially because on the page preceding the "ERISA Statement," the following declaration appears without any other language on the page: "This ERISA Statement is not part of this Group Insurance Certificate."  (R. at D1233.)  In addition, Plaintiff asks the Court to follow the Opinion of the Honorable Petrese B. Tucker of this Court in <u>Orantes v. CNH Grp. Ins. Plan</u>, No. 10-7215, 2011 WL 1376069 (E.D. Pa. Apr. 12, 2011), which rejected these two grounds as conferring discretionary authority on Prudential.

In <u>Orantes</u>, Prudential — also a defendant in that case — made the same two arguments advanced in this case, both of which Judge Tucker rejected.  Regarding the language "when Prudential determines," Judge Tucker stated: "the language highlighted by Prudential in support of this argument is insufficient to constitute a clear grant of discretionary authority as required under Third Circuit law."  <u>Orantes</u>, 2011 WL 1376069, at *3 (citing <u>Elms v. Prudential Ins. Co. of Am.</u>, No. 06-5127, 2008 U.S. Dist. LEXIS 76917, at *46 (E.D. Pa. Oct. 2, 2008) (finding the phrase "when Prudential determines" insufficient to confer unambiguous discretion upon Prudential)); <u>see</u> <u>Kinstler v. First Reliance Std. Life Ins. Co.</u>, 181 F.3d 243, 252 (2d Cir. 1999) ("Every plan that is administered requires submission of proof that will 'satisfy' the administrator.  No plan provides benefits when the administrator thinks that benefits should not be paid!  Thus, saying that proof must be satisfactory 'to the administrator' merely states the obvious point that the administrator is the decision-maker, at least in the first instance.")

Additionally, in <u>Orantes</u>, as in this case, the page preceding the "ERISA Statement" contained the following language: "This ERISA Statement is not part of this Group Insurance

Certificate." <u>Orantes</u>, 2011 WL 1376069, at *3; (R. at D1233). Judge Tucker stated: "The Third Circuit has not squarely addressed whether an ERISA Statement is a plan document. However, district courts in the Fourth, Ninth, and Seventh Circuits have had occasion to address this issue and have decided almost uniformly they are not." <u>Orantes</u>, 2011 WL 1376069, at *2; <u>see</u> <u>Woods v. Prudential Ins. Co. of Am.</u>, 528 F.3d 320, 322 (4th Cir. 2008); <u>Besser v. Prudential Ins. Co. of Am.</u>, No. 07-0437, 2008 U.S. Dist. LEXIS 116869 (D. Haw. Sept. 30, 2008); <u>Gingras v. Prudential Ins. Co. of Am.</u>, No. 06-2195, 2007 U.S. Dist. LEXIS 25071 (N.D. Ill. Apr. 7, 2007). "Only plan documents can be used to confer discretionary authority on an insurer." <u>Orantes</u>, 2011 WL 1376069, at *3 (citing <u>Gingras</u>, 2007 U.S. Dist. LEXIS 25071, at *18–19 ("[T]he ERISA statement is not a plan document and cannot be the source of the discretionary review . . . .").

The Court agrees with Judge Tucker's reasoning, the reasoning in <u>Elms</u>, and the reasoning of the Fourth, Ninth, and Seventh Circuits, and will apply a de novo standard of review to this case. Prudential has not cited any provision of the Plan conferring discretionary authority other than the language "when Prudential determines" and the text of the ERISA Statement, both discussed in detail in <u>Orantes</u> and found to be insufficient to confer such authority.

There is an additional reason why the arbitrary and capricious standard does not apply here and why Prudential is not entitled to such deference. In its Brief in Support of Prudential's Motion for Summary Judgment (Doc. No. 17–1), Prudential argues that it substantially complied with the procedural requirements of ERISA, despite the allegation that Prudential failed to resolve the appeal to the Appeals Review Unit within the period of time required under ERISA. (<u>Id.</u> at 35–36.) Prudential contends that if the Court finds Prudential violated ERISA's procedural requirements, de novo review is the proper remedy. (<u>Id.</u> at 38 (citing <u>Gritzer v. CBS,</u>

Inc., 275 F.3d 291, 296 (3d Cir. 2002) ("Where a trustee fails to act or to exercise his or her discretion, de novo review is appropriate because the trustee has forfeited the privilege to apply his or her discretion.").)

The Court finds that, by Prudential's own admission, it violated the procedural requirements of ERISA by failing to resolve the appeal within the period of time allotted under the ERISA Statement. The ERISA Statement provides:

> The Prudential Appeals Review Unit shall make a determination on your claim appeal within 45 days of the receipt of your appeal request. This period may be extended by up to 90 days if Prudential determines that special circumstances require an extension of time. A written notice of the extension, the reason for the extension and the date that the Prudential Appeals Review Unit expects to render a decision shall be furnished to you within the initial 45-day period.[10]

(R. at D1235.) There is no evidence in the Administrative Record that Prudential sent a written notice for an extension of time. Prudential admits that "Prudential's file contains a letter from Prudential dated April 22, 2011, affirming the decision to terminate Plaintiff's claim under the mental illness limitation." (Doc. No. 17–1 at 35.) April 22, 2011 is 303 days after Plaintiff's June 23, 2010 appeal. Therefore, de novo review is the proper standard applicable here for the additional reason that Prudential failed to comply with the procedural requirements of ERISA.

---

[10] It is clear from the language in the ERISA Statement that Prudential initially had forty-five days to decide the appeal, and that the initial forty-five day period could have been extended "by up to 90 days." However, in Prudential's September 2, 2009 letter to Plaintiff explaining the termination of benefits and his right to appeal, the following language is included:

> A determination on your appeal will be made within 45 days of the receipt of your appeal request. This period may be extended by 45 days, if special circumstances require an extension. You will receive written notice of the extension, the reason for the extension, and the date by which the Appeals Review Unit expects to render a decision, within the initial 45-day period.

(R. at D1106.) As noted above, Plaintiff cites this language limiting the potential extension to forty-five days. (See R. at 92.) It does not matter which language controls because Prudential did not issue a written notice seeking an extension at all.

When exercising de novo review, "the role of the court is to determine whether the administrator . . . made a correct decision.  The administrator's decision is accorded no deference or presumption of correctness.  The court must review the record and determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan."  Viera v. Life Ins. Co. of N. Am., 642 F.3d 407, 413–14 (3d Cir. 2011) (quotation marks and citations omitted).

IV.   **ANALYSIS**

The Court finds that Prudential incorrectly determined that Plaintiff's disability falls under the twenty-four month mental illness limitation, and thereby wrongly withheld long-term disability benefits.  Several of his treating physicians state that the reason for his disability is head trauma suffered in the accident, which caused tinnitus, memory loss, word recognition difficulties, headaches, depression, and anxiety.  Doctors commissioned by Prudential to review the medical judgments of his treating physicians disagree with those findings, but those physicians did not treat Plaintiff, and Prudential placed undue emphasis on those more favorable opinions.  Furthermore, evidence in the Administrative Record indicates that Prudential's consulting doctors sometimes relied upon faulty information or made clear errors in reaching their conclusions.

A.   **Definition of "Disability" and Plaintiff's Depression and Anxiety**

Prudential argues that Plaintiff "has not carried his burden of proving that he cannot work as a result of a diminished mental capacity."  (Doc. No. 17–1 at 31.)  This argument has little merit.  On May 7, 2009, Prudential itself determined that Plaintiff was "eligible for benefits on the basis of his claimed cognitive impairments."  (R. at D1113.)  After making this determination, Prudential retroactively paid disability benefits to him.  A short time later, Prudential terminated the benefits, finding that "Mr. White's restrictions and limitations are due

12

in whole or in part to his mental and nervous condition(s) of depression and anxiety.  As the

policy limits benefits payable for mental illness to 24 months . . . his claim is being closed."  (R.

at D1106.)  Prudential's decision was not based on a finding that Plaintiff was not disabled.

Rather, its decision was based on a finding that he was disabled, but his disability was due to

mental illness — specifically, depression and anxiety — and therefore limited to twenty-four

months of benefits.

Upon review of the medical evidence in the Administrative Record — the same medical

evidence Prudential reviewed when it determined that Plaintiff was disabled due to cognitive

deficits — it is abundantly clear, as Prudential conceded, that Plaintiff suffers from disabling

depression and anxiety.  For instance, Prudential cites a report from Dr. Picariello dated June 23,

2008 asserting:

> Mr. White displayed pain behavior during the interview, and had difficulty sitting
> in one position for any length of time.  His demeanor during the interview
> revealed that he was hyper-aroused and anxious.  At one point, he mentioned that
> he felt overwhelmed by the interview, and tears welled up in his eyes.
>
> Mr. White became visibly upset when discussing his flashbacks and dreams of the
> accident and his fears and beliefs that other drivers are going to hit him.  Other
> symptoms of posttraumatic anxiety include hype-vigilance [sic] and distress when
> driving or riding in a car.  His driving fears have caused him to suffer from
> significant limitations on his activities of daily living, which include his social
> and recreational life, and travelling to and from his doctor's appointments.
>
> Mr. White revealed flatness of affect and depressed mood and displayed feelings
> of helplessness and hopelessness about the future. . . .  Accustomed to being an
> active and productive individual, Mr. White currently feels weakened, vulnerable,
> and out of control of his life.

(R. at D789.)

Prudential cites the September 24, 2009 report of Dr. Sacchetti, stating that "[i]n

everyday life, Mr. White continues to report problems with concentration, working memory, and

short term memory.  His word retrieval deficits are readily apparent during our sessions, and he

has been able to establish a connection between his stress level and the frequency/severity of his word retrieval problems." (Doc. No. 17–1 at 14; R. at D197.) Prudential refers to another report from Dr. Picariello dated November 19, 2009 noting that Plaintiff "continued to report inability to concentrate, feelings of inadequacy . . . [and] also reported that he continues to be fearful and hypervigilant when driving a car and has flashbacks of the accident, which are upsetting and disturbing." (Doc. No. 17–1 at 17.)

The evidence in the Administrative Record demonstrates that Plaintiff is assuredly disabled under the Plan's definition. The first condition of a disability under the Plan is "you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury." (R. at D1210.) The Plan defines "regular occupation" as "the occupation you are routinely performing when your disability begins." (Id.) Therefore, if due to sickness or injury a person is required to leave their prior occupation but is still able to work in a different occupation, the person meets the first condition.

Plaintiff's job title prior to the accident was Chief Operating Officer, Chief Financial Officer, and Director of Risk Management. His occupation involved complex transactions and critical decisionmaking with a considerable amount of corporate responsibility, in addition to the fiduciary duties that came with his position as an officer. There is no evidence of a preexisting condition that caused cognitive impairments before April 21, 2007. After the April 21, 2007 automobile accident, he has difficulty concentrating, difficulty recalling words, anxiety, depression, fear of driving, and is plagued by post-traumatic stress disorder due to the automobile accident. He feels he is not able to control the direction of his own life — it is unreasonable under the circumstances to expect that he can perform the duties of controlling a corporation.

14

A vocational expert found that Plaintiff's post-injury occupation would be limited to "relatively unstressful, routine, structured, clerical/administrative work activity . . . such jobs as customer service representative, accounting clerk, entry level office manager, etc." (R. at D776.) While he may be able to perform low or mid-level business functions in a corporation, those functions are not his regular occupation, for which he was compensated $255,000 annually. Plaintiff is thus unable to perform the duties of his regular occupation "for which [he is] reasonably fitted by education, training or experience." (R. at D1210.)

The second condition of disability, a 20% or more loss in indexed monthly earnings[11] due to the sickness or injury, is also met. Prudential disputes only that Plaintiff has a disabling sickness or injury, and offers no evidence to counter a 20% loss in indexed monthly earnings. Having found that he is unable to perform the duties of his regular occupation, and there being no dispute that Plaintiff has endured a 20% loss in indexed monthly earnings, the Court will next consider whether Plaintiff "suffers a sickness or injury" within the meaning of the policy and whether the sickness or injury is due only to mental illness, making the twenty-four month limitation period applicable.

As noted previously, the relevant language in the Plan states:

> Disabilities which, as determined by Prudential, are due in whole or part to **mental illness** have a limited pay period during your lifetime. The limited pay period for mental illness is 24 months during your lifetime.
> . . . .
> **Mental illness** means a psychiatric or psychological condition regardless of cause. Mental illness includes but is not limited to . . . depression . . . or . . . anxiety . . . .

(R. at D1218–19 (emphasis in original).)

---

[11] Under the Plan, "indexed monthly earnings" are defined as "monthly earnings as adjusted on each July 1 provided you were disabled for all of the 12 months before that date. Your monthly earnings will be adjusted on that date by the lesser of 10% or the current annual percentage increase in the Consumer Price Index." (R. at D1211.)

In Morgan v. Prudential Ins. Co. of Am., 755 F. Supp. 2d 639 (E.D. Pa. 2010), Prudential terminated plaintiff's long-term disability benefits after twenty-four months, finding that his disability was due to mental illness.  Although plaintiff and his doctors asserted that he suffered from fibromyalgia which caused the secondary effects of depression and anxiety, Prudential, relying on the opinions of non-treating doctors, determined that plaintiff's depression and anxiety were an independent cause of his disability, separate from fibromyalgia.  Id. at 645.  In Morgan, the Court held:

> Even if the mental illness contributes to the impairment causing the disability, it is the physical condition, not the mental condition, that is the cause of the disability. Otherwise, whenever a claimant's physical disease or condition causes anxiety and depression, the mental illness limitation would always apply.  Thus, we conclude that in a claim such as Morgan's, where a mental condition is a sequelae[12] or component of a physical disease or condition, a mental illness limitation will not apply.

Id.

Following this reasoning, it matters not whether Plaintiff suffers from depression and anxiety as a result of the accident — the pertinent question is whether his depression and anxiety are sequelae or components of a physical disease or condition caused by the accident.  If the depression and anxiety stem from a physical disease or condition, the twenty-four month limitation will not apply.  This analysis advances the congressional objectives of ERISA.  See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 830 (2003) ("ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans, and to protect contractually defined benefits.") (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989)).

---

[12] A sequela is "an abnormal condition resulting from a previous disease."  The Random House College Dictionary 1201 (Jess Stein, ed., rev. ed. 1980).

Thus, the Court must determine whether: (1) Plaintiff suffered a traumatic head injury in the April 21, 2007 accident that caused depression and anxiety as a secondary effect; or (2) Plaintiff's depression and anxiety are purely psychiatric symptoms with no causal link to trauma endured in the April 21, 2007 accident.

**B.      Events of the Automobile Accident**

The most logical point to begin the analysis is the accident itself.  Plaintiff states that he lost consciousness in the accident, but Prudential argues there is no evidence of a loss of consciousness.  The best evidence of the events of the accident comes from the firsthand account of his son, James Jr., who was in the backseat.

James Jr.'s affidavit describes the following events: (1) While traveling southbound on Interstate 95, Plaintiff's wife, Anita, shouted "he's going to hit us;" (2) the other vehicle struck Plaintiff's SUV, causing it to flip over at least three times at high speed before sliding on its roof into the median of Interstate 95; (3) James Jr. did not lose consciousness in the accident; (4) when the SUV came to a rest, upside-down, Plaintiff and Anita were neither moving nor speaking; (5) James Jr. unbuckled himself and crawled on the inside of the roof to pull his younger siblings, Sophie and Colin, and his cousin, Thomas, out of the SUV; (6) at least sixty seconds after the car slid to a rest, and after rescuing his siblings and cousin, James Jr. then walked to the driver's side front window to assist his parents, who still had not moved or spoken; (7) upon reaching the driver's side window, Plaintiff suddenly began shouting "Sophie, Sophie, Sophie!," apparently unaware that James Jr. had already removed Sophie from the vehicle; (8) after helping Plaintiff out of the vehicle, Plaintiff appeared dazed, but began to assist his family members; (9) James Jr., Colin, Thomas, and Anita were taken to Hahnemann Hospital, while Plaintiff and Sophie were taken to Thomas Jefferson Hospital.  (R. at D120–22.)

17

Prudential contends that Plaintiff initially denied hitting his head or losing consciousness, both to the paramedics and hospital staff in the emergency room. He does not dispute this initial denial. Although this is a relevant fact, its importance is outweighed by his later complaints of headaches, tinnitus, memory loss, lack of concentration, and word-finding difficulties, and his doctors' diagnoses of post-concussion syndrome and head trauma. Plaintiff's explanation for the initial denial is that he "was originally unaware that he had been struck unconscious in the crash . . . [h]owever, once Plaintiff was able to speak with the other members of his family and the events immediately following the crash were discussed, it became clear that he had been unconscious for at least 60 seconds." (Doc. No. 18–1 at 5–6.)

This is a plausible explanation. The events of the accident and shortly afterward were chaotic. In a matter of seconds, Plaintiff's SUV went from a normal driving position to being flipped upside-down several times. Later, after crawling out of the vehicle, Plaintiff attended to his injured and distraught family located next to the wreckage of his overturned vehicle on the median of Interstate 95. James Jr.'s affidavit stated that Plaintiff appeared "dazed" after regaining consciousness. Plaintiff stated the same to his family doctor when he sought treatment less than a week after the accident. These circumstances provide a rational justification for Plaintiff's initial denial of a loss of consciousness.

The doctors who reviewed Plaintiff's file disagree widely with the doctors that treated him about whether he suffered a traumatic brain injury, the seriousness of the injury, the cause of his cognitive deficits, or whether he suffers from cognitive deficits at all. Generally, the doctors who treated him found that he suffered a traumatic brain injury that caused his neuropsychological symptoms, while the doctors commissioned by Prudential to review the file

18

— who did not treat Plaintiff — generally disagreed with the treating physicians, and reached medical conclusions that were favorable to Prudential.

The U.S. Supreme Court has noted that the administrator of a long-term disability program is not required to give special deference to a treating physician under ERISA, and may seek the opinions of outside consultants.  Black & Decker Disability Plan, 538 U.S. at 829–30. However, "[t]he Supreme Court's instruction does not authorize a plan to give conclusive weight to an unreliable report of a non-treating physician.  Nor does it insulate plan decisionmakers every time they decide to overrule a treating physician's report in favor of a consultant's opinion." Addis v. Ltd. Long-Term Disability Program, 425 F. Supp. 2d 610, 617 (E.D. Pa. 2006) (citing Black & Decker Disability Plan, 538 U.S. at 834); Morgan, 755 F. Supp. 2d at 646. Accordingly, the Court will analyze the medical evidence in the Administrative Record and will address the findings of both Plaintiff's treating physicians and the opinions of Prudential's non-treating consultants.

### C.    Plaintiff's Physicians

#### 1.    *Dr. DiBella, Dr. Anderson, Dr. Kralick, and Dr. Kaplan*

On April 28, 2007, less than a week after the accident, Plaintiff was examined by Dr. DiBella, his family physician.  He complained of headaches, and Dr. DiBella diagnosed him with post-concussion syndrome.  A diagnosis of post-concussion syndrome presupposes the incidence of a concussion, which is a traumatic brain injury.  (R. at D154.)

On May 15, 2007, nearly a month after the accident, Plaintiff saw Dr. Anderson, an orthopedic surgeon.  Dr. Anderson examined Plaintiff for neck and shoulder pain and found that he was "doing reasonably well," and planned to have him remove the neck collar he had been wearing since the accident.  (R. at D156–58.)

On June 12, 2007, Plaintiff saw Dr. Kralick, a neurosurgeon.  He complained of "headache, neck, back pain," and difficulty hearing.  (R. at D160–61).  Dr. Kralick characterized his neck pain as "not severe," and was confident his health would improve.  (R. at D902.)

On September 4, 2007, Plaintiff saw Dr. Kaplan, a doctor specializing in rehabilitation. (R. at D965.)  Dr. Kaplan observed that Plaintiff "reports headaches, memory loss, neck pain, back pain, fatigue, difficulty sleeping . . . shoulder pain . . . [and] paresthesias[13] in the hands.  He notes some ringing in his ears and vague word finding problems."[14]   (Id.)  Dr. Kaplan also stated that Plaintiff "only recently has . . . begun to pay attention to himself and he now notes continues [sic] symptoms that have never gone away."  (Id.)  Dr. Kaplan noted that Plaintiff "simply has been told [by his other doctors] that his ongoing symptoms would 'go away' but things haven't and he now is increasingly concerned."  (R. at D966.)  Dr. Kaplan's impression was that Plaintiff "remain[ed] symptomatic as a result of injuries sustained in a motor vehicle accident April 21, 2007," and diagnosed him with "1. Head trauma, concussion, post-concussion syndrome.  2. Cervical sprain and strain.  3. Lumbar sprain and strain.  4. Aggravation of underlying degenerative joint disease of the spine.  5. Internal derangement of the shoulder."  (R. at D967.)

2.     *Dr. Mañon-Espaillat*

On October 1, 2007, Plaintiff began seeing Dr. Mañon-Espaillat, a neurologist, who diagnosed Plaintiff with post-concussion syndrome and directed him to undergo an MRI.  (R. at D827.)  Dr. Mañon-Espaillat also prescribed nortriptyline, an antidepressant, for treatment of his post-concussion symptoms — not for depression.  (R. at D827; R. at D162.)  On October 9,

---

[13] Paresthesia is "an abnormal sensation, as prickling, itching, etc."  The Random House College Dictionary 966 (Jess Stein, ed., rev. ed. 1980).

[14] The sensation of ringing in the ear is also known as tinnitus.

2007, Plaintiff underwent an MRI, the results of which were "unremarkable."  (R. at D899.)  On

January 17, 2008, Plaintiff underwent a PET scan at Dr. Mañon-Espaillat's direction.

Later, following Prudential's termination of benefits, Dr. Mañon-Espaillat wrote in a

letter dated May 28, 2010:

> It is my opinion as Mr. White's treating neurologist, to a reasonable degree of
> medical certainty, that Mr. White sustained a traumatic brain injury in the auto
> accident of April 21, 2007 which resulted in persistent headaches and cognitive
> deficits causing a significant emotional and psychological strain on Mr. White and
> rendering him disabled from employment.  Further, it is my opinion that Mr.
> White's psychological symptoms are secondary to the traumatic brain injuries and
> cognitive deficits.
>
> Mr. White's brain injury directly caused his fixed or static dementia which is
> evidenced by his cognitive deficits.  It is my opinion, to a reasonable degree of
> medical certainty, that those cognitive changes in Mr. White's brain are
> permanent.

(R. at D162–63.)

> 3.   *Dr. Maitz and Dr. Divi*

On March 14, 2008, Plaintiff saw Dr. Maitz, a psychologist, for a series of

neuropsychological tests.  (R. at D231–37.)  Dr. Maitz noted that Plaintiff "sustained orthopedic

injuries and a post-concussion syndrome with loss of consciousness in a motor vehicle accident

on April 21, 2007."  (R. at D231.)  Dr. Maitz's impression of Plaintiff was that "he continue[d]

to experience persistent physical symptoms including musculoskeletal pain, headaches, and

severe tinnitus.  From a cognitive perspective, Mr. White continues to complain of persistent

problems with concentration, memory, and language skills . . . Mr. White appears to be very

anxious, depressed, frustrated, angry, and emotional [sic] labile."  (R. at D236.)  He found that

"Mr. White also is experiencing persistent cognitive problems that appear to be secondary to the

concussion he sustained in the 4/21/07 accident.  In addition, it is quite possible that his anxiety

and depression are exacerbating his neurocognitive deficits."  (R. at 237.)

21

On April 22, 2008, Plaintiff saw Dr. Divi, an otolaryngologist, for a review of the PET scan.  (R. at D125.)  Dr. Divi found that the PET scan demonstrated hypometabolic activity in his bilateral anterior temporal lobe, and concluded that this abnormality was an organic basis for his tinnitus.  (Id.)

### 4.    *Dr. Michel and Dr. Shapiro — Independent Non-Treating Consultants*

Dr. Michel and Dr. Shapiro did not treat Plaintiff, but conducted independent reviews of his file as consultants for Travelers Insurance Company.[15]  (Doc. No. 18–1 at 19.)  Dr. Michel's peer review report dated April 17, 2008 opined that Dr. Mañón-Espaillat's diagnosis of post-concussion syndrome was sound, and his prescription of antidepressants was medically reasonable and necessary.  (R. at D782.)  Dr. Michel also stated: "Although cognitive dysfunction is a particular part of the postconcussion syndrome, it usually resolves within a period of six months.  Yet, however, the literature is replete with cases persisting as long as two years and on rare occasions indefinitely."  (Id.)  Dr. Shapiro, reviewing Plaintiff's neuropsychological testing, also found that the neuropsychological testing was reasonable and necessary.  (R. at D786.)

### 5.    *Dr. Sachetti*

Plaintiff visited Dr. Sachetti, a psychologist, for a series of sessions.  On September 24, 2009, Dr. Sachetti sent a letter to Dr. Maitz, describing the outcome of his bi-weekly psychotherapy sessions with Plaintiff.  (R. at D197.)  He stated that Plaintiff seemed to be improving, but that he continued to get agitated when discussing the accident.  (Id.)  Dr. Sachetti

---

[15] Neither the Administrative Record nor the parties' memoranda of law explain the role of Travelers Insurance Company in this case.

conveyed that Plaintiff intended to become involved in fixing up a house for resale, which Dr.

Sacchetti encouraged in order to improve Plaintiff's self-esteem.[16]  (Id.)

      6.    *Dr. Picariello and Barry Belt, M.A.*

On November 19, 2009, Dr. Picariello and Barry Belt, M.A., psychologists, submitted a

report of their observations of Plaintiff.  (R. at 96–98.)  They described Plaintiff's speech as

"slow and labored," and observed "short-term memory problems . . . difficulty concentrating,

problems word finding and losing train of thought in the middle of a sentences [sic]."  (R. at

D97.)  The psychologists' November 19, 2009 report concluded:

> Prior to his accident, [Plaintiff] was a very successful and self-confident Chief
> Financial Officer of a Corporation.  Prior to his accident he felt "he could do any
> job that he set his mind to."  He reported earning $300,000 a year and had a
> wonderful family life and a satisfying social and outdoor recreational life.  He
> currently views himself as a "different person who cannot focus and accomplish
> anything."
>
> In our opinion, to a reasonable degree of psychological certainty, his current
> psychological problems are permanent and causally related to his [motor vehicle
> accident] on April 21, 2007.  In our opinion, based on the information provided to
> us, we opine that his future prognosis is guarded and poor.  Furthermore, in our
> opinion, his condition precludes him from obtaining any high level job in the
> future and, at best, [he] will be only able to perform a lower-level job resulting in
> a dramatic loss of income compared to his pre-accident earnings.

(R. at D98.)

---

[16] Plaintiff apparently stopped seeing Dr. Sacchetti after the September 24, 2009 letter was sent.
Prudential contends this termination of treatment is evidence that Plaintiff has improved to the
point where he is no longer disabled.  (Doc. No. 27 at 6–7.)  As discussed supra, this argument is
without merit.  Dr. Sacchetti's letter indicated that Plaintiff had improved and could discuss the
accident "without getting extremely upset," and had apparently progressed to the stage where Dr.
Sacchetti felt that future appointments would not be beneficial.  However, this does not mean
that Plaintiff was able to fulfill the functions of his previous occupation — to the contrary, Dr.
Sacchetti's letter explains that Plaintiff "continues to report problems with concentration,
working memory, and short term memory."  (R. at D197.)

**D.      Prudential's Reviewing Consultants**

1.      *Dr. Obianwu and Dr. Yohman*

In denying Plaintiff's first appeal, Prudential relied on the opinions of Dr. Obianwu, an orthopedic surgeon (R. at D855–63), and Dr. Yohman, a neuropsychologist (R. at D845–50), who reviewed Plaintiff's medical record.  Dr. Obianwu, when asked by Prudential to explain his opinion that Plaintiff was not functionally impaired, stated: "This man may have been functionally impaired, but it would have only been for approximately 6–8 and, possibly, 12 weeks after the accident.  Beyond that, none of the records indicate pathology that will be persistent and disabling."  (R. at D862.)

Dr. Yohman disagreed with Dr. Maitz's diagnosis of post-concussion syndrome and cognitive impairment, stating: "Dr. Maitz's conclusion that Mr. White's general level of performance in neuropsychological functioning was within the impaired range is not supported by his data."  (R. at D846.)  Dr. Yohman also opined: "In my opinion, Mr. White developed emotional distress as a result of his job termination.  This may have adversely affected his neuropsychological performance on some tasks."[17]  (R. at D848.)

For Plaintiff's second appeal, Dr. Maitz responded to Dr. Yohman's criticisms, including Dr. Yohman's opinion that Plaintiff developed emotional distress from his job termination, asserting that Dr. Yohman:

> attributed the "emotional distress" to Mr. White's termination rather than the injuries that he and his wife sustained in the accident.  However, this appears to be a gross assumption.  Given that Dr. Yohman never spoke with Mr. White, it is

---

[17] Dr. Yohman also stated that the notes of one doctor, Dr. Zalewski, pertained to a different James White and had mistakenly come to Dr. Yohman's attention: "These notes are likely for a different James White since they describe symptoms, findings, medications, behaviors (smoker, trying to lose weight, accompanied by mother), and recommendations not elsewhere noted for this case."  (R. at D847.)

difficult for me to understand how he was able to determine the cause of Mr.
White's underlying anxiety and depression.

(R. at D362.)  Dr. Obianwu and Dr. Yohman submitted reports reaffirming their original

positions.  (R. at D349–51, D352–54.)  However, Dr. Yohman added: "While I opined that

[Plaintiff's symptoms of anxiety and depression] resulted from his rather abrupt job termination,

it is possible that it was a result of the accident, as Dr. Maitz indicated."

### 2.   *Dr. Banks*

In April 2009, Dr. Banks, an external neurologist, submitted a report to Prudential.  (R. at

D335–44.)  Dr. Banks stated: "The hypometabolism described on the PET scan study certainly

results in cognitive deficits, and, in theory, the trauma that the claimant had, if there was head

trauma, could cause the finding, although additional medical factors . . . cannot be excluded as a

potential etiology."[18]  (R. at D341.)  Dr. Banks also noted:

> in his previous job as a Chief Financial Officer, higher cortical function is
> obviously necessary to multitask and perform a lot of delegating and supervisory
> tasks.  Based on the findings of the PET scan, there may be some areas of
> cognition that could be deficient . . . although psychologic issues could be playing
> a role as well.

(R. at D342.)  Prudential relied heavily on the report of Dr. Banks in its decision to grant

disability benefits for the initial twenty-four month period.  (R. at D1028–29.)

### 3.   *Dr. Attfield*

On June 25, 2009, shortly after granting Plaintiff's claim, Prudential referred Plaintiff's

case to another external reviewer, Dr. Attfield, a neuropsychologist.  (R. at D1019–20.)  On

August 20, 2009, Dr. Attfield submitted a report to Prudential, concluding that although Plaintiff

did in fact have cognitive impairment, his cognitive difficulties were psychiatric in nature.  (R. at

---

[18] Plaintiff contends that Dr. Banks mixed up his file with "the other James White" because he
cited to "a preexisting mental illness and other orthopedic and neurologic problems that Mr.
White did not have at the time of the accident."  (Doc. No. 1 at 12.)

D1013–19.)  Dr. Attfield based his conclusion in part on his belief that Plaintiff had been taking

antidepressant medication since May 2007.[19]  (R. at D1018.)

        4.    *Dr. Neuren*

On August 26, 2009, Prudential asked Dr. Neuren to review whether Plaintiff's

"cognitive symptoms are soley [sic] due to an organic condition."  (R. at D1012.)  Dr. Neuren

concluded that Plaintiff's "[r]ecords are inconsistent with a head injury that would have resulted

in cognitive impairment."  (R. at D1011.)

        5.    *Dr. Kolbell*

After Plaintiff appealed Prudential's termination of benefits, Prudential commissioned

Dr. Kolbell to review Plaintiff's cognitive impairments.  Dr. Kolbell concluded in his September

17, 2010 report that there was no evidence of cognitive impairments after December 1, 2009.  (R.

at D87.)  Dr. Kolbell stated:

> The claimant in my opinion is not cognitively impaired. . . . The effects of
> psychological factors, emotional distress or disturbance, suggestion of brain
> injury from other healthcare professionals, and the presence of litigation is well
> known, and widely reported in the scientific literature as significant contributing
> factors to subjective cognitive distress. . . . There is no evidence that claimant's
> conditions were present to a level that would prompt further evaluation or
> treatment.

(R. at D88.)  Dr. Kolbell's report advanced a new theory about the onset of Plaintiff's symptoms

— that the symptoms are largely exacerbated by Plaintiff's own doctors and the administrative

appeals process with Prudential.  Dr. Kolbell's opinion that Plaintiff does not suffer from

cognitive impairments is in contrast to all other doctors, including Prudential's non-treating

consultants.  See supra Part IV.C–D; (R. at D81–88.)

---

[19] Plaintiff denies he has been taking antidepressant medication since May 2007, and contends
that Dr. Attfield relied upon the medical record of the other James White — thus, his conclusion
was based partly on "an outright, demonstrable error."  (Doc. No. 18–1 at 25.)

6.    *Dr. Appelbaum*

On December 16, 2010, Dr. Appelbaum, a neurologist, issued a report to Prudential concluding that Plaintiff's "cognitive impairments, if present, are due to psychiatric factors, rather than a neurological disorder."  (R. at D43.)  Dr. Appelbaum's report contains a critical error by asserting that in Plaintiff's own affidavit, Plaintiff "denies any loss of consciousness." Plaintiff did not submit the affidavit.  It was sworn to and submitted by Plaintiff's son, James White Jr.[20]  (R. at D42; Doc. No. 18–1 at 32.)

**E.    The Administrative Record Establishes That Plaintiff Suffered a Traumatic Brain Injury on April 21, 2007 in an Automobile Accident**

The evidence in the Administrative Record supports Plaintiff's claim for long-term disability benefits.  James Jr.'s affidavit supports the notion that Plaintiff lost consciousness in the April 21, 2007 accident.  Dr. DiBella, Dr. Kaplan, and Dr. Mañon-Espaillat each diagnosed Plaintiff with post-concussion syndrome, thus finding that Plaintiff had suffered a traumatic brain injury in the accident.  Plaintiff later developed serious cognitive deficits as a result of the traumatic brain injury — deficits so severe that Prudential itself determined that Plaintiff was disabled, albeit for a twenty-four month period.  He also suffers from short-term memory problems, lack of concentration, and tinnitus.  Dr. Divi found his tinnitus had an organic basis as a result of abnormal hypometabolic activity discovered in the PET scan.  Although Plaintiff's disability may be due in part to mental illness, the mental illness was caused by a traumatic brain injury endured in the automobile accident, and therefore is not subject to the twenty-four month limitation in the Plan.

Although Prudential was permitted to use non-treating consultants to review the conclusions of Plaintiff's treating physicians, and was not required to give the treating physicians

---

[20] Dr. Appelbaum's report also makes references to the "other James White."

deference, the Administrative Record makes clear that Prudential's consultants did not consider objective evidence of continuing cognitive deficits stemming from the concussion.  Plaintiff's doctors, beginning with Dr. DiBella within a week of the accident, determined that he suffered from post-concussion syndrome due to a traumatic brain injury sustained in the automobile accident.  Although post-concussion syndrome usually clears up within months after trauma, in Plaintiff's case it did not, and he developed severe depression and anxiety as his symptoms mounted.  His fear of driving and nightmares related to driving also persisted.  Prudential's consultants, who did not treat Plaintiff, ignored this compelling evidence.

### F.    Errors in the Administrative Record

The Administrative Record shows that at some point early in the administrative appeal process, a portion of a file belonging to a different James White was mixed up with Plaintiff's file.  (See, e.g., R. at D130 (letter from Dr. Anderson at the Rothman Institute dated April 8, 2010 explaining that an incorrect progress note was mistakenly put in Plaintiff's chart).)  Several of Prudential's consulting doctors refer to the other James White in error.  Additionally, Dr. Appelbaum confused the author of the affidavit, who is Plaintiff's son, James White Jr., believing it to be a sworn statement of Plaintiff.  Dr. Appelbaum referred to a statement that the declarant "did not lose consciousness" in the accident, erroneously believing it to be a statement of Plaintiff's.

Prudential considered some of these faulty opinions in reaching its determinations, even if it did not totally rely upon them.  Prudential's decision to terminate benefits, for instance, cited Plaintiff's use of antidepressant medication since May 2007.  (R. at D1105.)  This was an error, as Plaintiff was not prescribed antidepressants until October 2007 by Dr. Mañon-Espaillat, who prescribed the medication not for depression, but for post-traumatic headaches.  (R. at D131.)  On March 31, 2011, Prudential's internal notes show a finding that Plaintiff has "no functional

28

impairment from either a cognitive or psychological perspective." (R. at D999.) The notes cite the assertion that Plaintiff "was awake throughout the accident," although that statement was made by Plaintiff's son, James White Jr. (R. at D1000.) Although Plaintiff's counsel pointed out these mistakes to Prudential on several occasions, it is apparent that Prudential did not correct the errors. (See, e.g., R. at D17–20 (letter from Plaintiff's counsel dated January 31, 2011 complaining to Prudential about its reliance on erroneous records).)

Prudential contends that these errors were not material and the Court should not give them weight. (Doc. No. 21 at 23–26.) Although it is not entirely clear how significant these errors were to Prudential's decisionmaking, these errors do not instill confidence in Prudential's review procedures. The opinions of Plaintiff's treating physicians were not plagued by such inaccuracy. Even if these errors were not material, the Court's determination that Prudential erred by terminating Plaintiff's benefits would be the same. See supra Part IV.C–E.

### G.      Mistakes Undermining Prudential's Fact-Finding

Plaintiff submits that the administrative appeal process within Prudential demonstrates that critical fact-finding mistakes were made by Prudential. Plaintiff contends, among other things, that: (1) Prudential did not provide a copy of his file upon request; (2) the Administrative Record is not organized; (3) Prudential did not decide Plaintiff's appeal at all, let alone in a timely fashion; and (4) Prudential arbitrarily reversed its position that Plaintiff was disabled due to cognitive deficits. (Doc. No. 28 at 18–24.)

An analysis of these problems accentuates the inaccuracy of Prudential's fact-finding. The Court has already determined that Prudential did, by its own admission, fail to decide Plaintiff's appeal in a timely fashion. See supra Part III. The Court has also addressed Prudential's treatment of the errors contained in the Administrative Record. See supra Part IV.F.

The organization of the Administrative Record is not ideal.  It is quite lengthy — 1240 pages long — but it does not have a useful table of contents or other guide to assist the reader. The index provided at the front of the Record gives cryptic descriptions of the contents, such as "Prudential SOAP Notes" or "Letter to PsyBar from Prudential re independent file review." Dates are given for the documents, but the dates are not in chronological order.  Although some related documents are grouped together, others are not, and related documents were often placed hundreds of pages apart within the Record.  Despite the fact that the organization of the Administrative Record was not optimal, it did not rise to the requisite level of prejudice.

The Court has addressed Prudential's reversal of position that Plaintiff no longer had cognitive deficiencies when reviewing the report of Dr. Kolbell.  This change of position was arbitrary.  Prudential granted Plaintiff benefits on the basis of cognitive deficiencies — its decision based on the assertion that the disability was due to cognitive defects — and paid benefits for twenty-four months.  On appeal, Prudential asked its consultants to determine if Plaintiff had cognitive deficiencies, when there was an abundance of evidence that he had such deficiencies.  Instead, the proper question to ask was whether Plaintiff's cognitive deficiencies were causally linked to a traumatic brain injury suffered in the April 21, 2007 accident.  The question of whether Plaintiff suffers from cognitive deficiencies already had been decided by Prudential.  Absent evidence establishing that Plaintiff's cognitive deficiencies had improved to the point where he could fulfill the role of chief operating officer of a corporation — and there is none — Prudential had no reason to revisit the issue.

Finally, regarding the copy of Plaintiff's file, Prudential argues that although it is required to produce copies of documents upon request, it is not required to provide documents before a final decision is made on appeal.  Prudential is correct that it need not produce copies of

30

a file during a review and before a final decision is made.  However, in this case, counsel for Plaintiff requested copies of the file on January 17, 2011, or 208 days after the June 23, 2010 appeal was filed.  As discussed above, this date was well past the forty-five day deadline to decide the appeal, and Prudential did not request in writing an extension of time to decide the appeal, which at best was an additional ninety days.[21]  Therefore, it is evident that Prudential wrongfully withheld the file from Plaintiff's counsel.  Although Prudential was still in the process of preparing a final decision, its time to do so had already passed.

## V.      CONCLUSION

Considering the Administrative Record, the Memoranda of Law in Support of their Cross-Motions (Doc. Nos. 17, 18), the Responses in Opposition (Doc. Nos. 21, 23), and the Replies in Further Support (Doc. Nos. 27, 28), and applying a de novo standard of review, the Court finds that Prudential's decision to terminate Plaintiff's long-term disability benefits was incorrect.  Plaintiff suffers from a sickness or injury caused by the April 21, 2007 rollover automobile accident that renders him disabled.  The disability does not fall under the Plan's twenty-four month limitation for disability due to mental illness because to the extent that his disability stems from mental illness, the mental illness was caused by a traumatic brain injury suffered in the April 21, 2007 automobile accident.  Therefore, Plaintiff's Motion for Judgment on the Administrative Record (Doc. No. 18) will be granted, and Prudential's Motion for Summary Judgment (Doc. No. 17) will be denied.

An appropriate Order follows.

---

[21] See supra n. 10 and accompanying text.